J.S29043/16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN RE: ADOPTION OF: B.J.F.-Z., A/K/A : IN THE SUPERIOR COURT OF
B.F.-Z., A MINOR : PENNSYLVANIA
:
:
:
APPEAL OF: T.F. :
:
: No. 1900 WDA 2015

Appeal from the Order Entered November 16, 2015
in the Court of Common Pleas of Allegheny County Orphans' Court
at No. CP-02-AP-0000100-2015

IN RE: ADOPTION OF: I.J.F.-Z., A/K/A : IN THE SUPERIOR COURT OF
I.F.-Z., A MINOR : PENNSYLVANIA
:
:
APPEAL OF: T.F. :
:
: No. 1901 WDA 2015

Appeal from the Order Entered November 16, 2015
in the Court of Common Pleas of Allegheny County Orphans' Court
at No. CP-02-AP-0000101-2015

BEFORE: BENDER, P.J.E., PANELLA, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.: **FILED MAY 05, 2016**

T.F. ("Mother") appeals from the orders dated November 12, 2015,

and entered on November 16, 2015, granting the petitions filed by the

Allegheny County Office of Children, Youth and Families ("CYF") to

involuntarily terminate her parental rights to her minor children, B.F.-Z.

(born in June of 2011), a male, and I.F.-Z. (born in February of 2013), a

---

[*] Former Justice specially assigned to the Superior Court.

female (collectively, the "Children"), pursuant to Section 2511(a)(2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).[1] We affirm.

We adopt the trial court recitation of the relevant history of this case. *See* Trial Ct. Op., 1/8/16, at 2-6 (unpaginated). Importantly, on June 11, 2015, CYF filed petitions to terminate the parental rights of Mother to the Children. On June 25, 2015, October 8, 2015, and November 12, 2015, the trial court held hearings on the petitions.

In orders dated November 12, 2015, and entered on November 16, 2015, the trial court terminated Mother's parental rights.[2] On December 4, 2015, Mother timely filed notices of appeal, along with concise statements of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On December 21, 2015, this Court *sua sponte* consolidated the appeals.

Mother raises the following issues on appeal:

> I. Did the trial court abuse its discretion and/or err as a matter of law in finding that Allegheny County Children, Youth and Families proved by clear and convincing evidence grounds for the involuntary termination of . . .

---

[1] In these orders, the trial court also terminated the parental rights of J.A.Z., the Children's father ("Father"), and any unknown father, pursuant to Section 2511(a)(1), (2), (5), (8), and (b). Neither Father nor any unknown father has filed an appeal or is a party to the present appeal.

[2] *See In re L.M.*, 923 A.2d 505, 508-09 (Pa. Super. 2007) (stating an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given).

Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (a)(5) and (a)(8)[?]

II. Did the trial court abuse its discretion and/or err as a matter of law in concluding that Allegheny County Children, Youth and Families met its burden of proving that termination of . . . Mother's parental rights would best serve the needs and welfare of the [C]hildren pursuant to 23 Pa.C.S. § 2511(b) by clear and convincing evidence[?]

Mother's Brief at 6.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, 608 Pa. 9, 9 A.3d 1179, 1190 (2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. Id. As we discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the

factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re S.P.*, 616 Pa. 309, 325-26, 47 A.3d 817, 826-27 (2012) (some citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained:

> [t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

We will focus our review on Section 2511(a)(2) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*     \*     \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-

being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

This Court has explained that the focus in terminating parental rights under Section 2511(a) is on the parent, but under Section 2511(b), the focus is on the child. *In re C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). The Supreme Court set forth our inquiry under Section 2511(a)(2) as follows.

[Section] 2511(a)(2) provides [the] statutory ground[] for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

[The Supreme Court] has addressed incapacity sufficient for termination under § 2511(a)(2):

> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re S.P.*, 616 Pa. at 326-27, 47 A.3d at 827 (citation omitted).

Instantly, the record substantiates the trial court's assessment of the evidence regarding Mother's incapacity to parent Children, and her inability to remedy the conditions and causes of her incapacity to parent Children, which we adopt herein. *See* Trial Ct. Op. at 7-8 (unpaginated).

In her brief, Mother argues that the trial court erred in finding that the grounds for termination existed under Section 2511(a)(2). She acknowledged her mistakes with Children and recognized that she needs to make better and healthier choices regarding smoking and using drugs and alcohol. Mother's Brief at 13-15. This Court, however, has stated that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002). A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Id.* As the trial court's factual findings, including Mother's longstanding recalcitrance, are supported by the record, and the court's legal conclusions are not the result of an error of law or an abuse of discretion, we affirm the trial court's decision with

regard to subsection (a)(2). *In re S.P.*, 616 Pa. at 325-26, 47 A.3d at 826-27.

Next, we review the termination of Mother's parental rights under Section 2511(b). Our Supreme Court recently stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [533 Pa. 115, 122, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 620 Pa. 602, 628-29, 71 A.3d 251, 267 (2013).

The trial court considered the needs and welfare of the Children and set forth its bond-effect analysis at length. *See* Trial Ct. Op. at 9-10 (unpaginated). Again, as the trial court's factual findings and credibility determinations are supported by the record, and the court's legal conclusions are not erroneous, we affirm the trial court's decision with regard to subsection (b). *In re S.P.*, 616 Pa. at 325-26, 47 A.3d at 826-27.

Mother argues that Children recognize her as their mother and engage in a loving relationship with her. Mother's Brief at 21. As we stated in *In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010), a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the

responsibilities of parenting." *Id.* at 1125 (citation omitted). Rather, "a parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004). Accordingly, we affirm the trial court's orders terminating Mother's parental rights.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  5/5/2016

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
ORPHAN'S COURT DIVISION

IN RE: ADOPTION OF:

I.F-Z. and B. F-Z.

TPR   CP-02-AP-0000100-2015 &
CP-02-AP-0000101-2015

APPEAL OF:

Superior Court Nos:

T███F.,
Natural mother

1900 WDA 2015
1901 WDA 2015

OPINION

January 8, 2016

Judge Cathleen Bubash

On June 10, 2015, the Allegheny County Office of Children, Youth and Families ("CYF") filed petitions for involuntary termination of the parental rights of the natural parents of I. F-Z. and B. F-Z, ("the children"). Appellant, T███ F. ("Mother") is the natural mother of the Children.

Hearings on the petition to terminate parental rights ("TPR") were held on June 25, 2015, October 8, 2015 and November 12, 2015 regarding both Children. At the time of the June 25, 2015 "show up" hearing, the Children had been in care for over 15 months. At the conclusion of the November 12, 2015 hearing, I found CYF had proven by clear and convincing evidence that grounds for termination existed and that termination best served the needs and welfare of the Children. Accordingly, on November 12, 2015, I issued Orders terminating the parental rights of the natural parents to the Children. Mother timely appealed and filed her 1925(b) Statements.

## Matters Complained of on Appeal

Mother raises identical issues in both appeals. She avers that I abused my "discretion and/or erred as a matter of law in finding that Allegheny County Children, Youth, and Families proved by clear and convincing evidence grounds for the involuntary termination of Birth Mother's parental rights pursuant to 23 Pa.C.S.A. §2511(a)(2), (5), and (8)." She further avers that I abused my "discretion and/or erred as a matter of law in concluding that Allegheny County Children, Youth, and Families met its burden of proving that termination of Birth Mother's parental rights would meet the needs and welfare" of the children, pursuant to 23 Pa.C.S.A. §2511(b).

For the reasons set forth below, my decision to terminate Mother's parental rights to the Children should upheld and my Orders be affirmed.[1]

## Statement of Facts

BF-Z. was born on 6/2/11 and IF-Z. was born on 2/14/13.[2]B The family first became involved with CYF in July of 2013 after a domestic dispute. (TR. 10/8/15, p. 40). CYF again became involved in November of 2013 after receiving a call regarding Mother's homelessness, neglect of the children, and unresolved drug and alcohol issues (TR. 10/8/15, p. 41).

Although she was very resistant to assistance, Mother was provided with intensive crisis in-home services on December 12, 2013. Mother was given a Family Service Plan ("FSP") on December 17, 2013 which she signed on January 3, 2014. The goals set forth under the FSP were:

> 1) recovery from substance abuse; 2) eliminate verbal and physical family abuse; 3) supervision of children, including baby gates and appropriate caregivers; 4) appropriate medical and dental care, including immunizations; 5) maintain contact and cooperate with CYF; 6)meet basic needs of food and clothing; 7) safe living conditions and

---

[1] Neither named father nor any unknown father participated in the proceedings but each had counsel who participated.

[2] Mother has two other children who are not part of these proceedings. An older daughter lives with her biological father and has not been adjudicated dependent. A younger sibling has also been removed from Mother. That child has been adjudicated dependent at CP-02-DP-0001055-2015. Mother has refused to name that child's father.

housing; 8) understand age appropriate behavior and expectations for children. (TR. 10/8/15, p. 49-52).

Little progress was made in Mother's parenting. For example, during an in-home visit by CYF the two year old son fell down the stairs. Mother did not go to the child when he fell, remaining sitting on a couch. When asked why she did not go to him, Mother answered, "Boys fall". (TR. 10/8/15, p. 42-44). CYF then provided Mother with baby gates but she would not utilize them. Further, Mother continued to engage in domestic violence, including a December 24, 2013 incident involving a knife where Mother was the aggressor. The Children were present during that incident. (TR. 10/8/15, p. 44-45). In-home services remained in place until February of 2014, when they were discontinued due to Mother's non-compliance.

The subject Children were removed from Mother's care on February 18, 2014 pursuant to an Emergency Custody Order due to concerns of neglect, parenting deficiencies including medical neglect, inadequate supervision, no food in home, and Mother's unresolved substance abuse and mental health issues. (TR. 6/25/15, p. 72). Bryn Albee, the caseworker who was present when the Children were removed, testified that Mother's home smelled of marijuana and alcohol and no food was found in the home. (TR. 10/8/15, p. 45-46). Mother was highly agitated, combative, overly rough with her infant, and verbally abusive. She refused a requested urine screen. (TR. 10/8/15, p. 83-85).

The Children were placed into emergency foster care. CYF filed a Dependency Petition on February 25, 2014 and the Children were adjudicated dependent on March 27, 2014. (TR. 10/8/15, p. 47). Later that month, the Children were moved to the foster home where they still reside with pre-adoptive foster parents.

Mother did not attend the next two FSP meetings scheduled on March 26, 2014 and August 14, 2014. (TR. 10/8/15, p. 48). A pattern of missed or cancelled drug screens and missed appointments required by the FSP followed and

Mother otherwise refused to cooperate with the agency. (TR. 10/8/15, p. 56-57, 60-61). Mother often could not be reached by phone. Over the fifteen months between removal of the Children and the first TPR hearing, Mother made little progress toward meeting the majority of the FSP goals set for her.

Additionally, Mother failed to be forthright with her caseworkers or the court. She claimed to be attending parenting classes at McKeesport Family Support Center but would not provide releases for CYF to acquire information on her attendance. Once she did sign the release, CYF found there was no record of her attending. (TR. 10/8/15, p. 54).

Mother also refused to attend a domestic violence class after the December 24, 2013 incident and, in fact, did not attend until September of 2014. (TR. 10/8/15, p. 58). Moreover, Mother has stated that she does not understand how domestic violence might affect her Children. (TR. 10/8/15, p. 58). Mother did not attend domestic violence classes from September 14, 2014 until March 15, 2015, which she asserted was due to incarceration. Her time in jail was, however, only from December 7, 2014 through January 13, 2015. (TR. 6/25/15, p. 40-41).

After refusing to attend her first scheduled court-ordered psychological evaluation on May 30, 2014, Mother was evaluated by Neil Rosenblum, Ph.D. of Allegheny Forensic Associates on October 22, 2014, at which time she was minimally cooperative. Dr. Rosenblum diagnosed Mother with Oppositional Defiant Disorder and Adjustment Disorder. He recommended that she seek mental health treatment once a week, as well as anger management. Mother did not complete her intake for mental health until May of 2015. (TR. 6/25/15, p. 15, 29-30).

Mother has been provided throughout these proceedings with two weekly supervised visits with her Children. Due to her inconsistent attendance, Mother was required to provide 24 hours notice of whether she would attend a scheduled visit to avoid the Children being transported and subsequently

disappointed. (TR. 10/8/15, p. 65). Of the 190 visits Mother was offered, 133 were completed. Of those, only 78 began on time, and 35 visits were cancelled due to no confirmation from Mother. (TR. 10/8/15, p. 155-156).

Susan Rosati, case specialist, testified that during visits, Mother was often inattentive to the Children, did not interact with them, and spent most of her time "on her phone." (TR. 6/25/15, p. 44).[3] Often, when she was asked by the Children to read to them or to play, she declined. (TR. 10/8/15, p. 165). Mother often displayed a negative attitude toward the staff. (TR. 10/8/15, p. 157). Mother left her infant in an unbuckled car seat on a table when she left the visiting room without securing anyone to watch the baby. (TR. 10/8/15, p. 160-161).

It was only after the filing of the TPR petitions on June 10, 2015 that Mother's behavior with the Children began to improve. (TR. 10/8/15, p. 157). Much of Mother's behavior remains troubling and her credibility has not improved. Mother has told her caseworkers that she lives independently, but has refused to show them her lease despite being requested to do so. (TR. 10/8/15, p. 65; TR. 11/12/15, p. 42, 73). Mother, who has a history of domestic violence, has denied being in a new relationship but has changed her social media "status" to "in a relationship" and has adopted the last name of a man she refers to as a neighbor. (TR. 10/8/15, p. 89-91; TR. 11/12/15, p. 28, 30-31).[4]

Mother remains inconsistent in attending meetings with the service providers and will focus only on meeting her housing goals. She will not address other FSP goals, such as parenting issues. She refuses to understand why CYF became involved. (TR. 10/8/15, p. 85-86). Especially troubling considering her

---

[3] This behavior changed and improved after the filing of the TPRs when Mother began taking her parenting classes more consistently. Mother has requested that her parenting classes continue as she believes they are helping her and the evidence supports that. (6/25/15 T. p. 34-35, 49-50)

[4] In her infant son's separate dependency matter, Mother demonstrated her continued lack of judgment and lack of credibility by colluding with a great-aunt to retain custody of that child against court orders, despite the woman's inappropriateness as a care-giver. After suggesting the great-aunt take custody, Mother then referred to her as unsafe. This subterfuge resulted in the baby being left by the great-aunt in the care of an unknown person. See TR. 10/8/15, p. 95-101.

history, Mother has continued to state to her caseworker, Bryn Albee, that she does not understand how her domestic violence affects the Children. (TR. 10/8/15, p. 58)

At trial, a number of witnesses testified, including Dr. Neil Rosenblum who conducted a series of individual assessments, evaluations and interactional interviews with Mother and the Children, and the foster parents and the Children. His expert reports were also admitted into evidence.

Dr. Rosenblum testified that the Children were bonded to their foster parents and saw them as role models. (TR. 10/8/15, p. 118-121). He testified that the Children had no strong attachment to Mother but did have a strong attachment to the foster parents. (TR. 10/8/15, p. 129-134). Dr. Rosenblum further testified that termination and adoption would enhance the Children's stability and be the "best choice for the Children and the choice that would be most consistent with their needs and welfare." (TR. 10/8/15, p. 136). He testified that the attachment to the foster parents was the Children's primary attachment and that it would be worse for the Children to lose their foster parents than it would be to lose Mother. (TR. 10/8/15, p. 142-148).

Additionally, Dr. Rosenblum testified that Mother's denial of her mental health issues as well as her denial of the risk factors she was creating for her Children; limit her ability to correct her parenting deficiencies. He testified that, since Mother's mental conditions and attitudes continue to exist, the Children would continue to be at risk if in her care. (TR. 10/8/15, p. 124, 139-140).

## Discussion

CYF seeks to terminate Mother's parental rights under 23 Pa.C.S.A. §2511(a)(2),(5), and (8). The statute provides for the involuntary termination of parental right if the petitioner can establish any one of the following grounds:

"2511.(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
\*\*\*\*\*\*\*\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
* * * * * *
(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
* * * * * *
(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child." 23 Pa.C.S.A. § 2511, *In re Adoption of R.J.S.,* 901 A.2d 502, (Pa. Super. 2006)

Once the statutory grounds for involuntary termination of parental rights have been shown by clear and convincing evidence, the Court must next consider the next step of the process and determine whether the termination would meet the needs and welfare of the child under sub-section 2511(b):

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection **(a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.**" 23 Pa.C.S.A. § 2511. *(emphasis added)*

The record in this matter reveals Mother's repeated and continuing incapacity to care for her Children so as to be reunited with them. Close to two years have passed since these young Children were removed from Mother's

care. The youngest has spent more than half of her life in placement. Mother did not meaningfully or consistently participate in the FSP process until after the TPR petitions were filed, more than fifteen months after her Children were removed. The conditions which led to the removal continue to exist.

Mother has, throughout these proceedings, demonstrated a lack of understanding of the consequences of her actions on her Children. Mother has failed, and often belligerently refused, to communicate and cooperate with CYF or to address the majority of the issues which led to the removal of her Children.

Despite Mother's recent efforts, she has not been able to meet her FSP goals to a degree that return of the Children to her care would be appropriate or feasible. Additionally, any progress she has made did not occur until June of 2015, after the filing of the TPR petitions and more than fifteen months after her Children were placed in foster care.

As the Superior Court has acknowledged:

> "The application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re J.F.M.*, 71 A.3d 989, 997 (Pa. Super. 2013).

The testimony establishes that Mother was offered a multitude of services to assist her in remedying the conditions which led to the removal of her Children. It also demonstrates that she did not actively participate in those services and, in fact, often refused to participate or lied about her participation. Grounds for terminating parental rights are not limited to affirmative conduct, but may include acts of refusal as well as incapacity to perform parental duties. *In re N.A.M.*, 33 A.3d 95(Pa. Super. 2011). Additionally, Mother was provided

time to remedy the conditions which led to removal and chose not to do so until the Children had been in care or over 15 months. I found that, even if Mother was offered additional services and more time, she would not be able to remedy the conditions in a reasonable amount of time.

In determining that termination of Mother's parental rights best served the needs and welfare of her Children, I considered the history of the case presented by her caseworkers and I relied heavily upon the testimony of Dr. Neil Rosenblum, who completed numerous evaluations in this case.

In his May 30, 2014 evaluation, Dr. Rosenblum found the Children to be thriving, and primarily attached with their pre-adoptive foster parents, with whom they have a primary bond and who they refer to as Mom and Dad. He found their attachment with Mother to be much less strong when he performed an interactional evaluation on October 22, 2014, and opined that the trauma of losing their relationship with their Mother would be less severe than what they would suffer should they be removed from their foster parents. Dr. Rosenblum concluded that termination of Mother's parental rights and adoption by the foster parents was in the best interest of the Children. I agreed, finding the evidence clearly established that termination of Mother's rights to the Children best served their needs and welfare.

I recognize that these Children have a relationship with Mother and I do not doubt the sincerity of Mother's love for her Children. However, a parent's emotional bond with her Children is only one of many factors to be considered in determining what is in the best interest of the Children. "Intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." In re C.M.S., 884 A.2d 1284, 1287 (Pa. Super. 2005). In this type of case, there is a dichotomy when a bond may exist between a parent and child, but the parent is either unwilling or unable to satisfy the minimum requirements of parenting. The issue is not whether there is a bond that exists, between the parent and child that would be harmful if severed; the issue is what

is in the child's best interests and welfare under the totality of the circumstances. *In re T.D.*, 949 A.2d 910, 920-921 (Pa.Super.2008)

Here, Dr. Rosenblum credibly described the lack of bond the Children have with Mother and the destabilizing effect termination of the bond with foster parents would have on the Children. (TR. 10/8/15, p. 144-145). Based on Dr. Rosenblum's evaluations and testimony, viewed in light of the other evidence presented, I found that severing the bond with Mother would be less detrimental and traumatizing to the Children and would best serve their needs and welfare based on the totality of the circumstances.

The Children have been living together in a stable and loving home since February of 2014, a significant part of their young lives. Although the Children may have some bond with Mother, their primary bond and attachment is with their foster parents who are ready, willing, and able to adopt them. Clearly, the Children's emotional, educational and medical needs are all being met in this home and, in fact, removal from this home would be harmful to them.

Prior to filing for termination, CYF made more than reasonable efforts keep Mother with her Children, and to reunite Mother with them after removal, efforts which Mother actively and stubbornly resisted until much too late. The Commonwealth is required to make reasonable efforts at reunification, but it "does not have an obligation to make such efforts indefinitely. The Commonwealth has an interest not only in family reunification but also in each child's right to a stable, safe, and healthy environment, and the two interests must both be considered." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super 2003). The record demonstrates that forcing these Children to wait any longer for stability would not be in their best interests. In light of Mother's unreliable efforts, these Children's need for a permanent, stable, and loving home must take precedence.

## Conclusion

After a careful review of the evidence, I found that CYF had clearly and convincingly established grounds for termination under 23 Pa. C.S.A. § 2511(a)(2), (a)(5), and (a)(8) and that termination of Mother's parental rights best serves the needs and welfare of both children. For these reasons, my Orders should be affirmed.

BY THE COURT:

Date: _1/8/2016_

_Cathleen Cawood Budash_, J.